Bibby & Donnelly v. Mortgage Investors Corporation, Edwards Charles Scarborough v. Amicus Curie Council Robert Henry Snyder Jr. v. Appellant Leslie Christine Esposito v. Appellee And why don't we begin with Mr. Snyder? Good morning, Your Honor. This is actually Mr. Scarborough for the United States as Amicus supporting the appellants. We thought it was appropriate for me to go first because materiality is the central issue and the United States is the one with the long-term institutional interest on that issue. In order to obtain loan guarantees from the VA, lenders must certify that they have not charged and will not charge prohibited fees on home refinancing loans. And in this False Claims Act case, relators alleged that the defendant, Mortgage Investors Corporation, falsely certified that it was complying with the fee restrictions while knowingly charging prohibited fees. Nevertheless, the District Court granted MIC's motion for summary judgment on the ground that there was insufficient evidence from which a reasonable fact finder could conclude that MIC's false certifications of compliance with the fee requirements were material under ESCBAR. The United States is participating in this appeal as Amicus supporting reversal because the District Court made at least two fundamental errors in assessing materiality. The District Court did not? Yes. I'm sorry. Did you say you're just addressing materiality? That's correct. And that's the sole issue. All right. Let me ask you this. Because maybe the parties assume we know things that I'm not sure we know. And I've read the part of the complaint that concerns it, and I've looked at the 26-18-20 form. But where is the decision to attach a guarantee, to issue a guarantee, made in this process and by whom, for a mass lender or whatever you call it, big high-volume lender like this one? Is it made at closing, when the closing agent or attorney examines it, makes sure that everything has been signed, the box has been checked, which says line 24B, the lender is not imposing, will not impose, and charges fees in excess of those permissible? Does the guarantee attach then or does the guarantee attach when it goes into the VA? Who makes the decision, okay, they've complied on paper? I believe the VA makes the decision, and that's the point of the materiality analysis. It's whether the fraud, in other words, here, the express fault certification that they're going to comply with the various fee restrictions, has a natural tendency or could have influenced the VA's decision to make the loan guarantee. That's the relevant point. In essence, it's sort of like a promissory fraud case. You are obtaining the guarantee. What goes to the VA at the time they say, okay, you get the guarantee? I believe the form in which, that Your Honor is referring to, in which the certification is made, there's a box, it's 24B, in which the undersigned lender certifies that he's not going to impose any charges in violation of the relevant statute, or the relevant drag, which is 38 CFR 36.4313. And is there anything in evidence that, I'm sorry, in the record, any evidence that all they look at is the certification at that stage before the guarantee is issued? I'm not sure I'm understanding the question, Your Honor. I mean, the VA clearly... Once the guarantee is issued, you know, these things don't hang around a month at the max before they're sold in the secondary market. That's the whole thing. It's like a heart. That's right. It's like an ongoing gathering of crops. That's right. All right. When does the guarantee attach so that they can be sold when the holder in due course protection attaches? I believe, and I can be corrected later if this is wrong, that it attaches at the closing. And the point is that it's the false statement that the defendant makes at the beginning is what induces the VA to act. And then lots of things flow from that. And one of the things is, for instance, that the VA, when it's sold, as Your Honor mentioned, to a holder in due course, the VA can't refuse to pay on the back end. The guarantee is locked into place. I understand that, although they could go against the initial issue. But what I'm trying to find out, it says material to the payment of so forth, performance. And, of course, here it's got to make the definition of materiality make any sense. It's got to be material to the issuance of the guarantee. Correct. And I don't understand how the guarantee can issue at the closing because the VA hadn't seen anything close. VA is not at close. I understand, Your Honor, but I believe that the forms are submitted in advance of the closing such that the lender has made the certification. I don't think there's any dispute that the certification is something that's made and the VA is made aware of. And there's ample testimony in this record from Jeff London and various other VA officials that if the agency had known that these entities were going to be charging these improper fees, they wouldn't have issued the loan guarantees. That's the sort of evidence that Escobar says would be relevant, would be strong evidence against materiality, is that if the agency knew about the fraud but nevertheless paid, we don't have a shred of that sort of evidence in this case. All right, but I've got some more questions. Hang with me. Sure. On the HUD-1 form, are those submitted in advance? I'm sorry. I'm not sure entirely exactly how the paperwork gets viewed by the VA, but I know certainly that the VA is aware of and sees the express certification that is made by the lender on the forms that they will not charge the inappropriate fees. Here's the question that puzzled me in viewing this. I went through again and it's still puzzled me. The VA turns this up in an audit based on the papers the VA has and I assume was given all along. So why, if those papers indicate a violation, why was the guarantee issued? How does that happen in the process and in the paperwork? How is that possible? Well, I think that's a critical distinction, Your Honor, between what the VA knew at the time that it was issuing the loan guarantees. And as I said before, there's not a shred of evidence in the record that the VA ever issued a loan guarantee while knowing that there were impermissible fees being charged or while knowing that a lender's certification that it was not going to charge those fees was false. All we have, and this is clear from the district court's decision, is frustration with what the VA did after the fact. In other words, when there were sort of allegations of fraud being made to this case, allegations generally about improper fees being charged, that the VA failed to take sufficiently rigorous enforcement action, at least in the district court's view. I understand. And your argument is that's not what the definition of materiality says. It's not whether it has the ability or capacity of affecting the sanctions if you find the violation. It's rather, instead, whether it has the capacity or natural tendency to influence the payment or receipt of, in this instance, the guarantee. I understand that. I just don't understand where all this attaches. And the best place we can look to find out the mechanics of step-by-step and when things come in and why the auditors can catch it but those who are responsible for granting the guarantee can't catch it is whose testimony on what part of the record. It's 1,500 pages. Where do we look? I think you look primarily to the testimony of the VA official, Jeff London, in particular. And it's quoted liberally in the district court's opinion. You know, the court cites London basically saying that, look, if the VA had been aware of the fraud at the time, it wouldn't have issued the guarantee. That's substantial evidence of the sort that Escobar says, you know, suggests that the thing is material. And the only thing the district court, and there's other things as well, the very fact that these are not only express conditions of payment but that the VA actually makes you make an express certification distinguishes this case from Escobar. It brings it out of the realm of implied certification to express certification. And that's sort of like the gold standard for materiality. That's the way an agency says, this is something that's really important to us. We're going to make you actually make an express representation about this thing. And so it's sort of a plus factor or extra powerful evidence of materiality. And the district court sort of ignored all of those indicia of materiality, including, for instance, the Escobar fact. I'm sorry. Counsel, I took you over. You've answered my question. Unless Judge Wilson wants to give you some more time, I don't have any other questions. Well, I think we have your argument, Mr. Scarborough. Okay. Thank you. Let's hear from Mr. Schneider. May it please the court, my name is Rob Schneider, and I represent the appellants. I'm going to try not to cover the same ground as Mr. Scarborough, but Judge Carnes, I think I have an answer to your question as to the mechanics. The way that this program worked, certain lenders were granted automatic authority to close these VA EARL loans. Yeah, the high-volume lenders. That's correct. So the way that it would work is mortgage investors find the borrower, they arrange for the closing, the closing happens. After the closing, they would then submit paperwork to the VA in order to obtain the guarantee. That paperwork did not include the HUD-1. The VA was never given the HUD-1 unless, during its routine audits, it asked mortgage investors to provide that paperwork. So there was no review by the VA prior to issuance of the guarantee of anything other than express certification by mortgage investors that it had not charged unallowable fees. They relied on the lenders to tell the truth. So there was no point prior to the issuance of the guarantee, which we totally agree is the materiality question here. There was no point prior to the issuance of the guarantee that the VA ever saw a lender charging unallowable fees. It was only occasionally at some point down the road during a routine audit that they would catch lenders charging and disclosing unallowable fees on the face of the HUD, and that's when the VA's refund policy would kick in. Let me ask you this. On the face of the HUD, when does the HUD drop into the process? HUD-1. The HUD-1 process for the VA? Yeah. I mean, by the time you get to the audit, the VA has the paperwork that shows that the lender was lying. That's correct. So that's long after the loan is closed. I'm sorry. The audit, of course, is long after the event. But when does the paperwork come into the process that's there and examined at the audit? During the audit itself. So there's a portion of the loans are the lender would get a request from the VA and say, you closed X loans during the last 60 days. We want 10% paperwork with respect to 10% of those loans. So there's an initial round of audits that happen soon after the loan closes, but after the guarantee is issued. And then the VA would also do periodic, every-other-year type audits where they would go to mortgage investors and they would say, bring us 200 files, specific files. We want to look at them, and they'd do an audit there as well. What's the relationship between the 26-18-20 form and the HUD-1? The HUD-1 is the transaction document between the lender and the borrower. It is not a document that has anything to do with the lender's request that the VA guarantee the loan. All the HUD-1 is, it's a closing statement. If you've ever closed your mortgage, you sit down at the table and you have a list of charges you have to go through, and both parties sign it. It's a private party document between the lender and the borrower, but it's proof of what these lenders were doing, and it is the main document that the VA would look to in attempting to determine whether lenders had charged unallowable fees. All right, let me answer this question. The 26-18-20, that's that close, right? The 26-18-20 form is signed... It's submitted by the lender after the closing, but the VA is not at the closing table. I know, but there is a closing attorney or agent there who is charged with ensuring that all the T's have been crossed and all the I's have been dotted, right? That's correct, and it is those parties who were engaged in this fraud. Well, it depends on whether the... I guess if the closing attorney, you're saying the closing attorney sees the HUD-1? The closing attorney would create the HUD-1, or mortgage investors would create it for them, and the attorney would sign it. So the way that the lender was able to pull this off was by using a corrupt closing attorney. In part, yes, and there's a substantial... Closing attorneys and title agents, so there's a substantial amount of evidence in the record that mortgage investors negotiated with its settlement agents to reduce the fees that were paid by mortgage... that were required to be paid by mortgage investors, like the closing fee, while at the same time increasing the fees paid by the veteran, like title work. So you take a normally... the lender is supposed to pay the closing fee on these loans. So you take a $500 closing fee. Mortgage investors are supposed to pay that. What they would do is they would reduce that fee to about $50, and they would take a title search fee, which should be about $150, and at the same time they'd add $450 to it. So the veteran pays $600 for a $150 fee, and mortgage investors pay $50 for a $500 fee. There was involvement by the settlement agents in this scheme with mortgage investors. Well, I think Mr. Scarborough has hit the high points on materiality. I think also it's important to note the posture of this ruling. This is a summary judgment ruling. In a multi-factor test like this, it's improper for the court, when there's evidence that supports a number of the factors of finding that materiality is present, to give dispositive weight to the government action prong of this test. In addition, in applying that prong... This is Judge Wilson. Let me just ask you. There came a point when the Veterans Administration became aware of noncompliance with the program, and after that, the administration did not seek recoupment or debar MIC from the loan program or take any other action to avoid making payments when borrowers defaulted. Universal Health v. Escobar sets a pretty demanding standard for materiality. Why did the district court get it wrong on that materiality issue, taking all those factors into consideration? The administration continued to make payments on the defaulted loans, even when it knew that MIC had charged improper fees, as long as they refunded the excess fee. That's pretty strong evidence that the requirement was not material, isn't it? I don't agree, Your Honor, for three reasons. First, there's no evidence that the VA ever had actual knowledge that mortgage investors engaged in fraudulent fee bundling, which is the relator's allegation here. The relator's alleged that MIC bundled fees for the express purpose of evading VA detection. The VA only ever caught lenders charging an unallowable fee and disclosing it on the face of the HUD, which the VA's officials testified they viewed to be an innocent oversight. They didn't see that as fraud. They did have knowledge of the relator's allegations at some point. The court used roughly 2009 as a gauge, but the VA did take action after that. It sent out a circular in 2010 to every single participant in the program that said, you can't charge unallowable fees, you can't charge anything above a reasonable and customary amount, and if you do, you're subject to civil and criminal penalties. In 2010 and 2011, it also changed its audit methodology in an attempt to catch the conduct that the relator said allegedly was going on. The methodology didn't work, and there's a lot of technical reasons why the relators believed the changed audit didn't catch its behavior. But the VA did, in fact, take action, and Escobar does not require that a VA, upon learning of allegations of fraud, seek to debar the defendant from the program. And this is a big federal agency with a lot of stakeholders and a lot of discretion as to how to enforce its regulations. The VA showed, through its enforcement actions, always ordering a refund when it caught an innocent violation, routine audits to try to catch the behavior, the circular, the additional audits, all of those things, plus the fact that this is an express certification case, are evidence in support of materiality. And on summary judgment, it wasn't appropriate for the district court or for this panel to say, it's impossible to find materiality here. There's also a disputed issue as to when, in fact, the VA knew exactly what the relators were alleging. They knew the allegations generally if the case was filed. It wasn't until mid-2015 when the relators provided the VA with a list of the loans that they said, these are the specific loans that are fraudulent. And by that point, Mortgage Investors was already two years out of their old business, stopped making loans in 2013. So that the agency didn't take additional enforcement actions against it at that point is fairly irrelevant. And finally, as to payments, the payments that were made on these loans had to be made because it's undisputed. Every single Mortgage Investors loan was transferred to a third party. And under the VA's regulations, that made the guarantee incontestable. Thank you. So that the VA continued to make payments doesn't have anything to do with materiality in this case because the payments had to be made. Quickly, before my time runs out, I just want to touch very briefly on the standing issue that we raised in our appeal as well. That's the question of whether the relators had standing to assert a fraudulent transfer claim. We believe this is a very simple question. The relators have a contingent right to payment because they are entitled to share in the proceeds of this lawsuit. Under the Uniform Fraudulent Transfer Act as adopted by Georgia, a contingent right to payment makes a person a creditor under the statute. And a creditor has standing to assert a claim. The enterprise financial case that we cited in our papers is clear on that. The district court got sidetracked by the Vermont Agency case. Vermont Agency's Supreme Court case has nothing to do with whether a relator has standing under the Fraudulent Transfer Act to assert a claim. And in fact, Justice Scalia in that case said that Congress can define new legal rights which in turn will confer standing, which is exactly what happened here. It wasn't Congress. It was the Georgia legislature when it adopted the Uniform Fraudulent Transfer Act and said that a person with a contingent, disputed, not reduced to judgment claim for payment has standing to bring a claim under the Fraudulent Transfer Act. Thank you, Mr. Snyder. You had your argument. Thank you. So, Judge Wilson, can I ask one quick question about this standing issue before we break? Yes. So, you know, you say that the district court got sidetracked by Vermont. But Vermont, you know, it seems to me says, look, these key town suits are kind of weird, outside the normal Article III course. Relators have standing by virtue of effectively an assignment from the government. But then the court goes on to say beyond that, you know, an interest that is merely the byproduct of the lawsuit isn't enough. And, I mean, isn't that effectively what you have here? You have an interest that is a byproduct of the underlying FCA claim? It is an interest that's a byproduct of the underlying FCA claim. But the Uniform Fraudulent Transfer Act, when layered on top of the FCA claim, is enough to give these relators standing. Because while Justice Scalia said a contingent interest in a FCA claim might not be enough to do it absent the assignment, the Georgia Uniform Fraudulent Transfer Act says even if you have a contingent interest, a contingent right to payment, then you do have standing to assert the claim. So I don't, Vermont agency did not answer the question of whether the relator's contingent interest in the lawsuit is sufficient to confer standing under a separate statute, which expressly allows contingent rights to payment to be asserted. So basically your position is that even though your claim fits within the language of what Justice Scalia said in Vermont, that it really is, your claim really is a byproduct of the underlying lawsuit, that Scalia just sort of didn't have in mind the sort of separate, separately acknowledged, separately created interest that you have under the Fraudulent Transfer Act. That's exactly right, and that's why I think Justice Scalia said in the Vermont agency case that Congress could define new legal rights which in turn would confer standing. And the new legal right that we're suggesting, that we're identifying here, is the right under the UFTA to assert a claim pre-judgment as a contingent creditor. All right. Thank you, Mr. Snyder. We'll now hear from Ms. Esposito on behalf of MIC. Yes, thank you, and may it please the Court, Leslie Esposito on behalf of Apelli's Mortgage Investors Corporation, or MIC, and William Edwards. The parties have litigated this case for over seven years, developed a vast record, and the district court carefully reviewed the record and concluded that no reasonable juror could find that the Apelli violated the False Claims Act. This court should affirm because relators lack sufficient evidence on two elements of their claim, materiality and causation. Under Escobar's rigorous and demanding materiality standard, which is not a four-factor test, there is very strong evidence that noncompliance with the at-issue regulations was not material because the VA, acting with full knowledge of relators' fraud allegations, audited MIC loans at issue, identified unallowable fees, and continued to honor the guarantees anyway. This is Judge Newsom. Can I ask you a question? Yes. The phrase you used there was that there is very strong evidence, and that may be true, but the burden you have is to show that no reasonable jury could conclude otherwise, and I guess your phrasing, to me, sort of reminds me of the district court's phrasing, where the district court said basically, look, there is some evidence here that might tend in the direction of materiality. There is the fact that it's a condition of payment, which Escobar says is not dispositive but is relevant. There is the fact that they were demanding refunds. That, too, is relevant. But then the district court says, but the sheer weight of the evidence is against materiality, therefore summary judgment. That sort of strikes me as precisely the sort of thing the district court should not be doing at summary judgment. Your Honor, I don't think that the judge was weighing the evidence by any means. I think she was looking and following the framework set up by Escobar and the case law that came after Escobar that basically said, FCA isn't for standard contract breaches. This is for serious, significant matters, and the test for materiality is rigorous and demanding, and the alleged fraud has to be material to the government's payment decision. And Escobar instructed courts that to determine whether it's material, you can look to things like, quote, very strong evidence that it's not material if the agency, in this case the VA, paid, continued to pay on a particular claim even with knowledge of a violation. And here, there is ample evidence that the VA, I mean, the VA paid on 90% of the at-issue loans after the relators met with them and informed them of their allegations. But just so we're clear, you know, your position, I take it, is that knowledge of allegations is sufficient? I believe it is sufficient. I believe they also... It says, right, I mean, Escobar says, let's see if I can find it in my notes, but Escobar says, actual knowledge that certain requirements were violated. That doesn't sound like knowledge of an allegation. That sounds like knowledge of a violation. But they had knowledge of a violation because they... An alleged violation or an actual violation? I just want to make sure I've got my head screwed on straight. Oh, yes, sir. Yes, Your Honor. The VA had knowledge of actual violations. They audited MIC loans, identified issues of unallowable fees. The VA themselves said in their deposition testimony that unallowable fee violations were the most common deficiency. And I thought that their testimony, though, was that they thought those were innocent oversights. They required refunds, and that had they known that this was fraud, they would have done more. And that the district court, frankly, kind of said, yeah, self-serving, conclusory, speculative. I'm not going to consider it. Well, I think with all due respect to what the district court said was, that's speculative. And under the case law, I shouldn't look at what's speculative when I have in front of me what actually occurred, which is... No, no. Actually, that's not what the district court said, page 47. District court has said, however, that speculative and seemingly self-serving post hoc statements primarily serve only to illustrate that the VA, assuming it unearthed such conduct, would have the option of declining to pay or revoke the guarantees. That's, you know, I'm with Judge Newsom. I'm troubled. I marked it with yellow flags throughout the district court's order, which sounded like the district court was doing a good job of judging the facts from the bench. I'm in awe of how thorough and well-written the opinion is. But I'm also nervous about what appears to be some of the treatment of the evidence at summary judgment stage. I think what's compelling here is that there is no evidence of materiality. And I think what Judge Totenberg did was follow the framework set out by Justice Thomas that said materiality is rigorous and demanding. Look at whether or not the government paid a type of claim or particular claim. And if so, that's very strong evidence. Well, let me ask you this. Was there any evidence about a specific guarantee that was issued even though the VA had knowledge that there had been a violation in making that loan at the time it issued the guarantee? Any evidence at all? Well, I think there is to circle back to an initial question that was asked of the government. In paragraph 50 of the complaint, the relators state that when the loan is closed, the lender sends a copy of the HUD form to the VA, and the lender certifies the accuracy with the 261820 form. So the VA received HUD I's when the loan was closed. They received HUD I's during all of the audits. They routinely identified unallowable fees. They even identified, the VA identified unallowable fees on loans at issue after the relator filed their complaint and still honored the guarantee. Counsel, you're saying that the VA had HUD I at the time the guarantee was issued. What I understood opposing counsel to say is they did not. Well, they had. Sorry, sir. It's one or the other. Well, Your Honor, I'm looking at the complaint that says that the HUD I was sent when the loan, quote, when the loan is closed, the lender sends a copy of the HUD form to the VA. And I think it's notable that the VA never revoked MIC's automatic authority with regard to- Wait, wait, wait, wait. Hold it. Stop. You are doing two different things, talking about two different things, and you're dodging the question. My question is, is there any evidence anywhere in this record as to a specific loan, one time or more, in which the VA, at the time the guarantee went into effect, was issued, knew that the box had been erroneously checked and falsely certified compliant? I don't know if there's evidence of a specific loan. I know there is evidence that despite knowledge of these violations, the VA continues to issue guarantees- No, but that's not my question. My question, if you want to prove to me something's immaterial, show me where the VA got the certificate, got the documents and had them performed, and made a decision to issue the guarantee knowing that it hadn't been certified to comply, or knowing that it was a lie that it complied. I don't see that- Let me put it this way. I haven't read the 1,500 pages. But the district court did not state that, and y'all haven't stated that in those specific terms in the brief. So when you keep arguing, the Supreme Court said it would be very material and do a lot of weight if it was shown that the agency or the government had paid or issued whatever was sought with knowledge that there was a violation. And you're saying we ought to infer from the fact that the audience turned up a lot of violations that they would have paid regardless in knowing about violations. Well, that's the kind of jury inference that gets past summary judgment. So I think what I'm actually saying is that there is substantial, compelling evidence that the VA repeatedly paid, and that's the language in Escobar, paid. They paid on the claims knowing that there was a fee violation, and under Escobar and the case law after that- Give me one page in the record where I can look for it that the VA ever paid-I'm sorry, of course they paid. That doesn't work. The materiality standard doesn't look to whether or not they honored the guarantee after it left the closing point. The question is, was it material to the issuance of the guarantee? With all due respect, I think the question is whether it was material to the payment, not to the issuance, because the question is whether it's material to the government's payment decision. And the VA could have opted not-they could have sought recourse against MIC, the original lender, if a loan defaulted. I think, to me, the relevant question under Escobar is whether or not it was material to the government's payment decision, and we have examples- Of course the government has to pay the guarantee to the holder in due course. I mean, there's no allegation to holders, some of which may be third or fourth hand, knew anything about the fraud, isn't there? Well, correct, but they never went after the original lender as they could have. So now, as I understand your argument, it is only material if the government agency employed the strongest possible sanction once they found that they had been hoodwinked and defrauded at the front end. If the government would not have issued a guarantee had it known on a specific instance that there had been fraud, that's not enough under your definition. We wouldn't have done it. Everybody stipulates and agrees we wouldn't have done it, is my hypothetical. But, you say all is forgiven if after they find out, they don't go after the lender with everything they've got. Is that your position? I don't think my position is quite that extreme. My position is, in this case, the evidence on the record, and you don't have to weigh it or make inferences, the compelling evidence is that the VA, the agency charged with implementing and enforcing the EARL program, which should get deference in determining what is material, the VA found these things not material, and they never took any action other than a refund when they found an unallowable fee. Let me ask you a question to try to focus you, because I feel like Judge Karnes still hasn't gotten an answer to his question. So if I could just focus you on what I think is the key passage in Escobar. Escobar says that evidence that something is a condition of payment is not dispositive but is relevant. You acknowledge, right, that this was, in fact, a condition of payment? Yes, correct, Your Honor. Okay, so check. The second thing that Escobar says is, if the government pays a particular claim in full, despite actual knowledge that certain requirements were violated, that's very strong evidence that it wasn't material, but I don't think that you've been able to point yet to a particular claim in response to Judge Karnes that the government paid despite actual knowledge of a violation. Which leaves you, I think, with the third sentence, which is that if the government pays a particular type of claim, despite actual knowledge that requirements were violated, then that's strong evidence of immateriality. Now, you might be able to get to a particular type of claim, maybe, in response to Judge Karnes. You couldn't point him to a specific loan for a specific claim, but maybe you can get to a type of claim. I'm still not, frankly, sure that you can get all the way to actual knowledge that requirements were violated as opposed to allegations. But it just seems to me, earlier you said in response to a question that I asked, you said there is no evidence of immateriality. I don't think that that is right. I mean, the condition of payment alone, Escobar says, is at least relevant. And it seems to me here the district court weighed, in her own terms, weighed the evidence, the sheer weight of the evidence, and decided that countervailing factors carried the day. And that just doesn't strike me as summary judgment decision making. Two points, and thank you, and I apologize if I didn't answer the prior question. That certainly was not my intent. There are examples of specific MIC loans that were audited June 18, 2008. The VA said, at issue loan number 967 was audited, and the VA said there's an unallowable fee, just like the relators did. We refunded it, and then they still paid on the guarantee. There's another example, December 19, 2008. How could they not, counsel, I'm sorry, given the statute, how could they not pay on the guarantee? Are you saying the guarantee, they paid the original lender on the guarantee? That this is one of those one out of a thousand loans where the lender said, well, this looks pretty good. I think we'll hold it. You know how the secondary market functions. I mean, the record in this case reflects that. These things don't spend a month in the original lender's portfolio. They're bundled and sold. To clarify. The record indicates that. So how do you not pay a guarantee to a holder in due course? To clarify, they paid and did not go after MIC for the money? They did not. That's a different thing. Well, it's a step removed, but your argument again, just so I understand it, and I'm not overlooking anything, is materiality doesn't just matter and doesn't focus on whether they issue or would have issued the guarantee had they known the truth at the time. Materiality instead focuses on whether they took every possible sanction once they found out there was noncompliance. Correct? Yes, except I don't think they had to take every possible sanction. I think here the VA has said that this was not material. But to be clear, you don't even have to get to materiality. I'm sorry. Whoa, whoa, whoa. I understand that because, see, I used to do a good bit of it myself. But where did the VA say this was not material? Where did they say, quote, this was not material, end of quote? Well, I think through their actions. There is no direct quote. Well, that's different from saying, counsel, is it not? It is, but I'm relying on Justice Thomas and Escobar saying that for materiality, it's rigorous and demanding, and the FCA shouldn't apply to just any old violation of a regulation, and that the most compelling evidence is the action that the government took in terms of payment when they knew. And if you look at the actions in the record, the VA's actions indicate that they did not consider any of this material. But you don't even have to get to materiality because relators have no evidence of causation. And you could also rule on the causation standard. Well, I'm not really sure. This is Judge Newsom, just speaking just for myself. I'm not really sure that we want to wade into proximate cause, an issue that the district court didn't touch, especially proximate cause seems like a pretty facty issue to me, and the district court itself said there are tons of facts here. I think here with causation, thank you, ma'am. There are no facts because the relators admitted repeatedly on the record that they have no evidence of causation, they didn't investigate causation, their expert made no opinion on causation, there is zero for causation. So it's that complete lack of evidence of causation. There are no facts to look at. There's nothing. And relators admit it. So I think with regard to materiality, I don't believe, I do believe Judge Totenberg did a thorough review of the case law and properly applied the standard laid out in Escobar, and I think she should be affirmed because of the compelling evidence and the deference given to the VA and the compelling evidence as defined by the case law that the VA considered the regulations here not material, and there are examples of regulations that they did consider material. So for those reasons, it warrants dismissal of all claims. All right. Thank you, Ms. Esposito. Thank you very much, Your Honors. Mr. Scarborough, have you reserved time for rebuttal? Thank you, Judge Wilson. Just to pick up on a few points, Judge Carnes, with respect to your question, there is no evidence in the record that the VA ever issued a guarantee with actual knowledge that unallowable fees had been charged. There's no evidence of that. There is no evidence that the VA ever made a payment to an originating lender with actual knowledge that unallowable fees had been charged. The only evidence, what the VA knew during the course of this case, they knew a little bit about the relator's allegation. They also knew that occasionally lenders were charging unallowable fees and were disclosing those fees on the face of the HUD, and they viewed those as innocent violations. They did not have actual knowledge that the lenders were engaging in the conduct that the relators alleged, which was bundling unallowable fees into allowable fees for the express purpose of evading detection. If you look at a HUD-1, an MIC HUD-1 with bundled fees, it does not appear from the face of the HUD apparent that they have charged unallowable fees because the boxes that have numbers in them are all boxes for fees that they were allowed to charge. The numbers are insulated, and if you go through MIC's files, as the relators have done in discovering this case, you can see how behind the scenes they were manipulating those fees to make it look compliant. But the VA never had actual knowledge for any of these at-issue mortgage investors' loans that an unallowable fee had been charged and not refunded. In fact, the refund policy is strong evidence of materiality. Even when the VA caught lenders engaging in innocent fee violations, what they viewed as innocent, on the face of the HUD violations, without exception, every single time, they ordered the lender to refund the fees. And it was only after a refund that any payments were made. And Judge Carnes, you're exactly correct. The payments in this situation are totally irrelevant. It is 100% undisputed that none of these MIC loans, the claims on these loans were not submitted by MIC. There's not a single loan in this case where MIC received the payment. Very quickly on causation, Judge Newsom, I think you're exactly correct. This is a difficult factual issue. Even if Ms. Esposito was correct about the position on causation, the case would still have to be remanded to go forward as a penalties-only case. The Miller case that they rely on, which we contend is distinguishable and it's in our papers, the Fifth Circuit said even if there's no proximate causation for damages, the case can proceed for penalties only. So a remand to the district court for a trial on that sticky factual issue is totally appropriate here. Appreciate the panel's time, and we'd ask that you refer to the district court. This is Judge Wilson. Let me just ask you one more question. So if I go to the record, where would I find evidence in the record that the VA made payments on defaulted loans, knowing that MIC had charged improper fees? There is no such evidence. There is no evidence that the VA ever paid any loan to any lender with knowledge that they had charged unallowable fees. The only evidence that they ever knew that any unallowable fees were charged is when they would catch the lender during the audit. And without question, every single time when they did that, they ordered the lender to refund the fees. So if I go to the record, is there any testimony that the VA made payments on the loans without knowing that MIC charged improper fees? There is. I may not be following your question, Your Honor, but there is testimony in the record that from Jeff London. By a VA representative? Jeff London, who was the VA's 30B6 representative, that the VA never had actual knowledge that the lenders were engaging in this bundling conduct that the relators allege. I thought Jeffrey London testified as only to hypotheticals and not to any particular action that took place. He only spoke about hypothetical Veterans Administration action. He was asked, Your Honor, did the VA know that the lenders were fraudulently bundling unallowable fees? And his answer to that was no. That's not a hypothetical question. Speaking for the agency, the official testimony of the agency is the VA never had actual knowledge. Doesn't he hypothesize about what the government would have done? He did. Would William White, on the other hand, spoke directly to the relevant question? The VA's actual pattern of behavior? They both talked to the question of, they did have to speculate a little as to what the VA might do if they had ever had actual knowledge. But they both denied actual knowledge. And if you look in our papers, our opening brief at 12 to 16 and the reply brief at 18 and 19, there's a long list of all the things that the VA didn't know about how mortgage investors were engaging in this fraud. And they never knew, per Jeff London, there was never any actual knowledge on any particular loan that there was fraudulent bundling going on. I think I'm out of time for my rebuttal. I'd like the panel to have more questions. Thank you very much. Thank you. Mr. Schneider, have you reserved some time for rebuttal? That was it. Okay. All right. Well, that completes the argument. The case was well argued. Thank you, counsel. Thank you.